AMERICAN EDUCARE, LTD., PATRICK MORETTI, TAX MATTERS PARTNER, ET AL., Petitioners [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent American Educare, Ltd. v. Commissioner
Docket Nos. 34128-87, 38384-87, 7081-88, 22864-88
United States Tax Court
T.C. Memo 1990-159; 1990 Tax Ct. Memo LEXIS 142; 59 T.C.M. (CCH) 212; T.C.M. (RIA) 90159; March 26, 1990
*142 Respondent issued a Notice of Final Partnership Administrative Adjustment to petitioner-partnership and statutory notices of deficiency to the individual petitioners. These notices were issued after expiration of the initial statutory periods of limitations, but within the time permitted by petitioners' facially valid written consents to extend the periods of limitations. Petitioners urge that the consents are invalid because their execution was premised upon respondent's false representations. They contend that respondent should be estopped from relying upon the consents to establish that his notices were timely, and that we must therefore find the assessments to be time-barred. Held, petitioners have failed to prove either the false representations or the adverse effects necessary to justify the imposition of estoppel. Allan P. Harris and Leon A. Van Geldern, for the petitioners. Carolyn Lee Harber and Thomas R. Thomas, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, within the time allowed by written consents extending the periods of limitations, issued notices disallowing claimed deductions and credits of petitioner-partnership and of the other petitioners in these consolidated cases. [2] The issues are whether petitioners have proved that their consents to extend the periods of limitations are invalid because *146 the consents were induced by respondent's alleged misrepresentations. If the consents are invalid, then the notices of disallowance are untimely and respondent is barred from assessing the deficiencies, additions to tax, or resulting interest at issue. In that event, only the deficiencies and additions to tax and related interest for petitioners Robert and Paula Snelling for the taxable year 1984 may be assessed. If, however, the notices were timely, the parties have stipulated to the amounts that would be disallowed. In that case, a Rule 155 computation would be necessary to determine the resulting deficiencies, additions to tax, and related interest. *147 FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and attached exhibits are incorporated by this reference. One of the petitioners is a partnership, American Educare, Ltd., which has 36 partners. It is before the Court pursuant to the "TEFRA" provisions -- that is, it is representing its partners with respect to matters relating to the "Tax Treatment of Partnership Items," under statutes added to the Internal Revenue Code by section 402(a), Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 648. The other petitioners are individuals. They are four married couples -- the Salooms, the Snellings, the Newells, and the Mitchells -- who filed joint Federal tax returns for the years involved. They are here pursuant to the deficiency procedures set forth in sections 6211 through 6216. [3]
The individual petitioners are not partners in American Educare. Petitioners all have in common their 1983 investment *148 in a promotion known as Children's Educational Leasing, or "CEL." Of the individual petitioners, the Mitchells invested in CEL through a proprietorship. The Salooms, the Snellings, and the Newells all invested through their own separate partnerships. The proprietorship and these separate partnerships are not themselves parties to this proceeding. The individual petitioners' partnerships were apparently small partnerships that were not covered by the TEFRA procedures applicable to larger partnerships, such as petitioner American Educare. The CEL Promotion
The CEL promotion was explained by one of the petitioners as an activity that involved a series of audio tapes that would be reproduced for sale in retail stores as children's products. These tapes were designed to be educational presentations in which "a couple of young detectives and a floppy-eared dog" would make presentations "about things like Charles Lindbergh and the Wright brothers and Marconi * * *." The promotion offered tax benefits to its investors through presumed deductions and tax credits. Respondent questioned the tax benefits that were claimed by the investors for their investments in the CEL promotion. *149 Respondent's Appeals Officer Bill R. Majure was in charge of respondent's appellate consideration of cases involving the CEL promotion. By June 27, 1986, respondent's Appeals Office had established a national settlement position with respect to taxpayer-investors in the CEL activity for the taxable year 1983. In brief, that settlement position was as follows -- 1. An investor would be allowed to deduct 50 percent of his cash investment in CEL. 2. An investor would not be allowed to claim the investment tax credits arising from the investment in CEL. 3. The addition to tax for valuation overstatements under section 6659 regarding investment in CEL would be reduced from the proposed 30 percent to 20 percent. 4. The interest on substantial underpayments attributable to tax-motivated transactions under section 6621(c) would be applied to the entire underpayment attributable to investments in CEL; and 5. Respondent would not impose the negligence additions. While respondent's settlement position resolved the general issues relating to investments in CEL, it did not, in and of itself, resolve all the issues relating to the examination of the CEL promotion; in particular, *150 it left unresolved the issues relating to the specific returns of each of the taxpayer-investors. For example, respondent's agents were required to verify the amount invested in the CEL program by each taxpayer. These procedures required respondent's agents to obtain information from the individual taxpayers, including their canceled checks or other records. Respondent's agents would then examine the records, and evaluate the results in terms of the promotion and the taxpayer's other liabilities. Respondent's agents were required to prepare a final report with respect to each taxpayer. Respondent's procedures then contemplated settlement negotiations with the taxpayers. In that regard, respondent would have modified his settlement position with respect to a taxpayer-investor whose case presented unique facts and circumstances that justified modification of the settlement position. Such modifications from a national program would be "rare," but, in Mr. Majure's words, "it has happened." Respondent's Appeals Office generally intended, however, that the settlement position was to be available to all investors in CEL. With respect to a given taxpayer-investor, the examination would *151 be completed only with the taxpayer's protest of the examining agent's findings to respondent's Appeals Office, or with the issuance of a statutory notice of deficiency, or with a waiver of restrictions on assessment and collection. Petitioner American Educare
American Educare is a partnership whose principal place of business at the time the petition was filed was Dallas, Texas. In 1983, American Educare invested in the CEL promotion. In documents submitted to respondent, it describes its business as "The marketing and distribution of children's educational tapes." American Educare filed its U.S. Partnership Return of Income (Form 1065) for the taxable year 1983 on or before April 15, 1984. All the losses, income, and investment tax credits that were reported on that return related to the CEL program. One Patrick Moretti was the tax matters partner for American Educare for the taxable year 1983. As such, he was the individual responsible under the TEFRA provisions for representing American Educare's partners before respondent on matters concerning the tax incidents of American Educare. Respondent, during February of 1987, sent an undated letter to Mr. Moretti in *152 care of Mr. Harris, American Educare's attorney. In that letter, respondent solicited a consent to extend the time within which respondent could assess the taxes attributable to the operations of American Educare for the taxable year 1983. Respondent's employee, Angie Sanderlin, negotiated the proposed consent with American Educare. She told Allan P. Harris, American Educare's attorney, that the consent was necessary to permit respondent time to determine the manner in which to offer the CEL settlement proposal to American Educare. Prior to April 2, 1987, and after consulting with Mr. Harris, Patrick Moretti signed the requested "Special Consent to Extend the Time to Assess Tax Attributable to Items of a Partnership" (Form 872-O). The terms of that document provided that the period of limitations for American Educare's 1983 tax year would be extended indefinitely. Revenue Agent Sanderlin executed the Form 872-O on behalf of respondent for the taxable year 1983 and returned the form to American Educare on April 2, 1987. On April 15, 1987, respondent sent a Notice of Final Partnership Administrative Adjustment (FPAA) to PAE Enterprises, a three-member partnership which apparently *153 had as one of its constituent partners petitioner-partnership American Educare. PAE Enterprises is not itself a petitioner in this action but is involved in a separate proceeding. See PAE Enterprises v. Commissioner, T.C. Memo. 1988-222. From the time she solicited the consent from American Educare until her maternity leave began on June 1, 1987, Revenue Agent Sanderlin made attempts, but was unable, to determine the procedures for offering the settlement proposal to American Educare. Her difficulties arose in attempting to ascertain the manner by which binding settlements were to be made administratively with a partnership pursuant to procedures reflecting the TEFRA partnership provisions. Mrs. Sanderlin sought advice on how to proceed from her regional office. In May 1987, that office informed her that respondent's national office was working on the problem, which had arisen with respect to another similar situation. She was told that, pending resolution of the question involved, she should "suspense" her case with American Educare. On May 15, 1987, Revenue Agent Sanderlin informed Mr. Harris that she would "suspense" the case and would contact him when *154 respondent had determined how to offer the settlement proposal to American Educare. On June 1, 1987, Ms. Sanderlin took maternity leave. The fact that an FPAA had been sent to PAE Enterprises, while no settlement offer had come to American Educare, was upsetting to Mr. Moretti and Mr. Harris. After May 15, 1987, the date of the last contact with Agent Sanderlin, however, no one on behalf of American Educare had contacted respondent until respondent received a letter dated June 23, 1987. On that date, Mr. Harris wrote to Ms. Sanderlin (who was then on maternity leave) discussing the background of the examination and then stating: On April 15, 1987 a Statutory Notice was issued to PAE Enterprises, of which American Educare is a partner. To date no settlement offer has been extended to American Educare, Ltd. It is clear that no settlement offer will be forthcoming. Accordingly, I enclose herewith a duly executed form 872-N, terminating the prior agreement. By its terms, the effect of the Form 872-N was to terminate the consent to extend the period of limitations. Once respondent received the Form 872-N, he had 90 days within which to resume proceedings with respect to taxes *155 incident to the 1983 operations of American Educare. On August 10, 1987, 47 days after he received the Form 872-N from American Educare, respondent mailed to American Educare the Notice of Final Partnership Administrative Adjustment, or FPAA, for the taxable year 1983. American Educare then instituted this case and a petition was filed on October 19, 1987. On February 6, 1988, Appeals Officer Bill Majure sent a letter to Mr. Harris, transmitting respondent's offer of settlement of the CEL issue with respect to American Educare. The stipulations of the parties indicate that the amounts at issue have been reduced to arrive at deficiencies in accord with that settlement proposal. That settlement, however, will take effect only if we determine that petitioner's execution of the consent to extend the period of limitations is valid. If, however, we determine that the consent is invalid, respondent would not be able to assess any deficiencies attributable to partnership items relating to the 1983 operations of American Educare. On May 6, 1988, some 7 months before this case was tried, Appeals Officer Bill Majure wrote to Mr. Harris regarding American Educare "to provide additional *156 information to you to address your concerns regarding the sequence of events that resulted in a notice of deficiency [sic] being issued in the above-referenced case." The letter stated, "It appears that a mix-up occurred, since the case of American Educare Ltd. was being handled differently." Petitioners B. George and Deborah Saloom
At the time petitioners B. George and Deborah Saloom's (hereinafter the Salooms) petition was filed, they resided in San Diego, California. The Salooms filed their joint U.S. Individual Income Tax Return (Form 1040) for the taxable year 1983 on or before April 15, 1984. At the time of trial, B. George Saloom had been employed in the banking industry as a data processing manager for approximately 10 years. The Salooms invested in the CEL promotion in 1983 through an entity known as M & S Enterprises. In connection with their investment in CEL, the Salooms deducted $ 7,625 in expenses. They also claimed investment tax credits that reduced their potential tax liability of $ 4,170 for the year 1983, and resulted in a refund on their tax return for that year. Additionally, early in 1984 the Salooms received tax refunds from their 1980, 1981, *157 and 1982 tax years totaling $ 7,279, due to claimed carrybacks of unused investment tax credit arising from their investment in CEL. On September 8, 1986, respondent contacted the Salooms to verify losses with respect to M & S Enterprises claimed on the Salooms' 1983 Form 1040. The following month, on October 19, 1986, respondent wrote to the Salooms to obtain their consent to extend the period of limitations for assessing and collecting their taxes for the year 1983. Respondent's letter bore the heading "In re: Children's Educational Leasing," and stated, in part, as follows -- We are examining the tax return of an entity in which you have an interest. Adjustments may be proposed that could affect your federal income tax return for 1983. The limitation period prescribed by law for assessing additional tax will expire before the entity's examination is completed. We would, therefore, appreciate your extending the limitation period by signing and dating all copies of the enclosed consent, Form 872A, and returning them within 10 days from the date of this letter. * * * If we propose adjustments with which you do not agree, extending the limitation period will give you time *158 to present your views, if you wish. * * * If we do not receive your consent we will have to send you a notice of deficiency. You will then have 90 days from the date that notice is mailed to you * * * to file a petition with the United States Tax Court. If you do not file a petition within that period, the law requires that we assess and bill you for the deficiency. The Salooms then consulted Mr. Mark T. Winsor, their tax accountant, who held their power of attorney. At Mr. Winsor's request, respondent modified the consent form to restrict the issues to those involving M & S Enterprises. The Salooms and Mr. Winsor executed the restricted consent on January 7, 1987, and January 15, 1987, respectively. The consent extended the period of limitations for any adjustment related to M & S Enterprises for the taxable year 1983 until April 15, 1988. In signing the restricted consent, Mr. Saloom knew that he was extending the period of limitations. On February 12, 1987, respondent executed the Form 872 as modified and returned a copy to the Salooms. Mr. Winsor represented the Salooms before respondent's Appeals Office. In February of 1987, Mr. Saloom learned of respondent's settlement *159 position regarding CEL by means of a form letter that Mr. Saloom had received, addressed to M & S Enterprises in the name of a Mr. Moore, Mr. Saloom's partner in M & S Enterprises. Having thus learned of respondent's settlement position with respect to CEL, the Salooms provided Mr. Winsor with copies of canceled checks reflecting Mr. Saloom's cash investment in CEL. On February 12, 1987, Mr. Winsor wrote to respondent, enclosing copies of Mr. Saloom's checks relating to the CEL investment. In July of 1987, after discussing the matter with Mr. Harris, the attorney for American Educare, Mr. Saloom signed a Form 872-T, seeking to terminate the extension of the period of limitations he had executed the previous February. [4] A statutory notice of deficiency was mailed by respondent's Appeals Office to the Salooms on September 16, 1987. Respondent disallowed all deductions and credits claimed with respect to the CEL program for the years at issue. The Salooms have since accepted respondent's settlement position with respect to their investment in the CEL program. The settlement will take effect only if, in this proceeding, we determine that petitioners' consent to extend the period *160 of limitations was valid. Otherwise, the period within which respondent could assess any of the amounts at issue with respect to the Salooms would have expired. Petitioners Robert and Paula Snelling
At the time petitioners Robert and Paula Snelling's (hereinafter the Snellings) petition was filed, they resided in Douglasville, Georgia. Mr. Snelling was a flight instructor with Delta Airlines for approximately 16 years. The Snellings filed their joint U.S. Individual Income Tax Return (Form 1040) for the taxable year 1983 on or before *161 April 15, 1984. During the taxable year 1983, the Snellings participated in CEL through the partnership Snelling Investments. In connection with their investment in CEL, the Snellings deducted $ 15,250 in expenses and claimed a credit of $ 10,253 against their Federal tax liability for 1983. Additionally, respondent issued refunds to the Snellings of income taxes paid in the amount of $ 7,398 for their 1980 taxable year and $ 3,823 for their 1982 taxable year, based upon their claimed carrybacks of unused investment tax credits from the 1983 taxable year. In addition to their participation in CEL, the Snellings had invested in real estate and stock. On October 3, 1986, a revenue agent named Helen Firor contacted Ben W. Carmichael, Jr. Mr. Carmichael is a CPA authorized by the Snellings to represent them on tax matters. Ms. Firor and Mr. Carmichael discussed respondent's general settlement position with respect to the tax incidents of the Snellings' investment in CEL. Mr. Carmichael further responded to Agent Firor in a letter dated October 6, 1986, containing several questions and comments regarding the proposed settlement. On November 6, 1986, Mr. Carmichael wrote to Appeals *162 Officer Bill Majure, enclosing a copy of his earlier letter to Ms. Firor and generally arguing the Snellings' case as to their investment in CEL. On December 3, 1986, respondent wrote to the Snellings, seeking a consent to extend the time within which their taxes for 1983 might be assessed and collected. The letter states, in relevant part -- While considering your Federal tax return [for the taxable year 1983], we found that the limitation period prescribed by law for assessing additional tax is due to expire soon. Unfortunately, we need more time to consider all pertinent questions. The letter bore no reference to CEL; rather it was headed with a reference to Mr. Snelling's Social Security number. On December 15, 1986, after consulting with Mr. Carmichael, the Snellings executed the consent to extend the period of limitations to April 15, 1988. In signing the consent, Mr. Snelling understood that he was extending the period of limitations. In the summer of 1987, Mr. Snelling discussed his situation with Mr. Harris, the attorney for American Educare, who then became Mr. Snelling's attorney. Relying on the advice of Mr. Harris, Snelling executed and sent to respondent *163 on July 24, 1987, a Form 872-T, "Notice of Termination of Special Consent to Extend the Time to Assess Tax." [5]
Respondent issued a notice of deficiency with respect to the Snellings on February 4, 1988. Respondent disallowed all the deductions and tax credits that petitioners had claimed for each of the years involved as a result of investing in the CEL program. The parties have since compromised the amount of deficiencies *164 on the basis of respondent's settlement position. That settlement, however, will be effective only if we determine that the Snellings' consent extending the period for assessment was valid. Otherwise, the period for assessments would have expired. Petitioners Joe E. and Elisabeth Newell
At the time they filed their petition herein, Joe E. and Elisabeth Newell (the Newells) resided in Madison, Georgia. Mr. Newell had been employed in the food industry for approximately 15 years. The Newells filed their joint Form 1040 for the taxable year 1983 on or before April 15, 1984. During the taxable year 1983, Mr. Newell participated in CEL through the partnership N & E Enterprises. The Newells claimed an investment tax credit of $ 7,772 on their income tax return for 1983, plus a deduction of $ 7,625 for expenses relating to the investment in CEL. Additionally, on April 23, 1984, respondent issued refunds to the Newells of income taxes paid in the amount of $ 4,673 for the taxable year 1980 and in the amount of $ 1,265 for the taxable year 1981, based upon the claimed carryback of unused investment tax credit in the amount of $ 5,938 from their taxable year 1983. On October 29, 1986, respondent *165 wrote to the Newells, enclosing a report which set forth the basis for respondent's determination that the Newells could deduct none of the $ 7,625 cash allegedly paid for their investment in CEL. The report had been prepared by respondent's employee, Tax Auditor Gail Lee. On the same date, respondent also wrote to the Newells seeking their consent to extend the period of limitations for the assessment and collection of taxes relating to their taxable year 1983. The letter was substantially the same as that sent to the Snellings, explaining that, "we need more time to consider all pertinent questions." Mr. Newell then contacted Gail Lee, who informed Mr. Newell that more time was needed and that cooperation with respondent was in the Newells' best interest. Mr. Newell understood the effect of signing the consent. The Newells did in fact sign the consent, extending the period of limitations for an indefinite period. On December 19, 1986, respondent sent a letter to the Newells, returning to them a copy of their consent on Form 872-A, and explaining the mechanics of revoking the consent by use of the Form 872-T. On February 24, 1987, respondent wrote to the Newells again, with *166 a new proposal that was consistent with the general settlement proposal for all CEL investors. In March of 1987, the Newells sent a Power of Attorney form to respondent, appointing J. M. Treadwell, Jr., CPA, as their representative. Later that month, the Newells signed and sent to respondent a letter, prepared by Mr. Treadwell, protesting the adjustment set forth by respondent. Mr. Treadwell also telephoned respondent's Appeals Office and then reported to Mr. Newell that respondent's settlement offer was firm, and not negotiable. Respondent's Appeals Office mailed a statutory notice of deficiency for the taxable years at issue to the Newells on June 14, 1988. The Newells have since accepted the settlement position of respondent. Once again, that settlement will become effective only if we determine that the consent to extend the period for assessment, executed by the Newells, is valid. Petitioners Norman E. and Bette W. Mitchell
At the time petitioners Norman E. and Bette W. Mitchell (the Mitchells) filed their petition herein, they resided in Denver, North Carolina. Mr. Mitchell has a college degree in marketing and has been in the business of marketing computers *167 for 14 years. He also has interests in oil wells and residential real estate. The Mitchells filed their joint Form 1040 for the taxable year 1983 on or before April 15, 1984. The Mitchells participated in the CEL promotion through an entity known as Mitchell Cassette & Books. As the result of their 1983 investment in CEL, the Mitchells claimed a deduction of $ 12,250 for expenses relating to the CEL program and a tax credit for that year of $ 21,614. The Mitchells also claimed carrybacks of the unused investment tax credit in the amount of $ 7,086 for 1980 and $ 6,951 for 1981. On October 20, 1986, respondent wrote to the Mitchells to obtain their consent to extend the period of limitations for assessing and collecting their taxes for the year 1983. Respondent's letter was virtually the same as that sent to the Salooms. It referred to Children's Educational Leasing and stated, in part, "We are examining the tax return of an entity in which you have an interest. Adjustments may be proposed that could affect your federal income tax return for 1983." Mr. Mitchell consulted his accountant, Phil Purdue, who advised him to sign the consent form. Mr. Mitchell understood the legal *168 effect of signing the consent. The Mitchells did sign the consent, on October 27, 1986. On December 31, 1986, respondent returned a copy of the executed consent, Form 872-A, with a letter advising the Mitchells of the procedures for terminating the consent, if they chose. On January 9, 1987, respondent sent a letter to the Mitchells. It represented that the "person to contact" was one E. Thorstenberg, and it set forth respondent's settlement position. It also requested copies of the Mitchells' checks regarding their investment in CEL. In response to this letter, Mr. Mitchell, on January 21, 1987, sent to Mr. Thorstenberg copies of his checks indicating the amount of the Mitchells investment in CEL. On February 26, 1987, respondent, through Revenue Agent Thorstenberg, sent to the Mitchells the following three items which he had prepared: (1) A Report of Individual Income Tax Examination Changes (Form 1902-B) and Explanation of Items (Form 886-A) for the Mitchells' taxable year ended December 31, 1983; (2) a Report of Individual Income Tax Examination Changes and Explanation of Adjustments for the Mitchells' taxable year ended December 31, 1981; and (3) a Report of Individual *169 Income Tax Examination Changes and Explanation of Adjustments for the Mitchells' taxable year ended December 31, 1980. Each of these documents reflected implementation of respondent's settlement position as set forth in the January 7, 1987, letter from Agent Thorstenberg to the Mitchells. On April 9, 1987, the Mitchells executed a Form 2848, appointing Allan P. Harris, who is also the attorney for American Educare, as their attorney-in-fact for purposes of representing them before the Internal Revenue Service. On June 6, 1988, Mr. Harris sent to Revenue Agent Ralph Pierce a letter enclosing a copy of Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, with respect to the Mitchells. The document indicates that it was executed by Mr. Harris on September 23, 1987. The parties agree, however, that respondent did not receive any notice of termination regarding the Mitchells until June 20, 1988. The delay between the execution of the Form 872-T and its receipt by respondent is not explained. On July 1, 1988, respondent mailed a statutory notice of deficiency to the Mitchells. [6] Respondent disallowed all the deductions and credits claimed by the *170 Mitchells as a result of their investment in the CEL program for all the years at issue. The Mitchells have since accepted respondent's settlement position with respect to the deficiencies at issue. Again, any deficiency based upon the settlement is contingent upon our finding that the consent executed by the Mitchells is valid. OPINION We consider here whether the various consents to extend the periods of limitations executed by petitioners are valid. If they are valid, then the periods for assessment of taxes, interest, and additions to tax were extended and respondent's issuances of the statutory notices were timely. If, however, *171 the agreements to extend the time are found to be invalid, then the period within which to assess the deficiencies in tax, additions to tax, and interest has expired. Petitioner American Educare is a partnership which is subject to the TEFRA partnership audit and litigation provisions of Code sections 6221 through 6233, inclusive. For such a petitioner, section 6229(a) provides that the period for assessing any Federal income tax attributable to any partnership item for the partnership's taxable year extends to the end of the 3-year period following the later of (1) the date on which the partnership return for such taxable year was filed or (2) the last day for filing a return for that year. Section 6229(b)(1), however, provides an exception to the 3-year period applicable to partnerships. The assessment period may be extended (1) with respect to any partner, by an agreement entered into by respondent and such partner, and (2) with respect to all partners, by an agreement entered into by respondent and the tax matters partner or any other person authorized to enter into such an agreement *172 by the partnership. The agreement must be executed before the expiration of the original 3-year period. With respect to the individual petitioners -- the Salooms, the Snellings, the Newells, and the Mitchells -- section 6501(a) provides (with certain exceptions not material here) that respondent shall assess deficiencies in income taxes within 3 years after the return is filed. Section 6501(b)(1) provides that, for the purposes of section 6501, a return filed before the due date shall be considered as being filed on the date it is due. An exception to the 3-year provision is provided in section 6501(c)(4), which allows a taxpayer and respondent to consent in writing to extend the period for assessment, if such an agreement is made before expiration of the 3-year period. The expiration of the period of limitation on assessment is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability. Rules 39, 142(a). To establish this defense, *173 petitioners must make a prima facie case establishing the filing of their returns, the expiration of the statutory period and receipt or mailing of the notice after the running of the period. Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); Robinson v. Commissioner , 57 T.C. 735, 737 (1972). Where the party pleading the defense makes such a showing, the burden of going forward with the evidence shifts to respondent who must then introduce evidence to show that the bar of the statute is not applicable. Adler v. Commissioner, 85 T.C. 535, 540 (1985). Where respondent makes such a showing, the burden of going forward then shifts back to the party pleading the affirmative defense to show that the alleged exception to the expiration of the period is invalid or otherwise inapplicable. Adler v. Commissioner, supra.The burden of proof, i.e., the burden of ultimate persuasion, however, never shifts from the party who pleads the bar of the statute of limitations. Adler v. Commissioner, supra.
*174 An agreement to extend the period of limitations for assessment and collection is not a contract but rather a waiver of a defense. Stange v. United States, 282 U.S. 270 (1931); Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983); Tallal v. Commissioner, 77 T.C. 1291 (1981), affd. on other issues 778 F.2d 275 (5th Cir. 1985). In determining the validity of such a waiver, however, contract principles are important, because section 6501(c)(4) requires a written agreement, and we look to the objective manifestations of mutual assent to determine the terms of such an agreement. Schulman v. Commissioner, 93 T.C. 623, 639 (1989); Piarulle v. Commissioner, supra at 1042. With respect to petitioner American Educare, the parties have stipulated that its partnership tax return (Form 1065) for 1983 was filed by April 15, 1984, and that the general period of limitations would have expired on April 15, 1987. American Educare and respondent agree, however, that they executed a facially valid consent agreement (Form 872-O) before the expiration of the limitations period. Based upon that *175 consent, the period of limitations for partnership items was extended indefinitely. The Form 872-O remained in effect until respondent received the Form 872-N notice of termination on June 24, 1988. Respondent then had 90 days within which to send an FPAA to American Educare. Within 47 days of June 24, 1988, respondent sent an FPAA to the partnership. The FPAA was therefore timely under the terms of the consent. The individual petitioners in this case all filed their Forms 1040 for 1983 on or before April 15, 1984. Under the provisions of section 6501(a), the period of limitations on assessment of additional taxes for that year would have expired on April 15, 1987. The parties agree, however, that each of the individual petitioners and respondent executed facially valid consent documents before April 15, 1987. Under the terms of these documents, the period of limitations for the Salooms was extended to April 15, 1988, for the Snellings until April 15, 1988, and for the Newells and Mitchells, for an indefinite period of time. Although several parties attempted to revoke their consents, only the Mitchells did so effectively. By the terms of their Form 872-A, respondent was *176 required to issue a statutory notice of deficiency to the Mitchells by September 18, 1988. The notices of deficiency relating to the year 1983 were sent to the Salooms on September 16, 1987, to the Snellings on February 4, 1988, to the Newells on June 14, 1988, and to the Mitchells on July 1, 1988. Under the terms of the consents, the statutory notices of deficiency were timely. Based on the foregoing, we hold that mutual assent to the consent forms at issue was established by the uncontroverted showing of the parties' signatures thereon. Kronish v. Commissioner, 90 T.C. 684, 694 (1988). Respondent's demonstration that the statutory notices were timely mailed pursuant to facially valid consents required petitioners to prove that the consents are not valid. They have failed to do so. In attempting to meet their burden, petitioners argue that the consents are invalid because they were induced by respondent's alleged fraud in characterizing various aspects of respondent's progress toward effecting settlements of the cases involved. Initially, we note that petitioners were all aware of the nature and consequences of signing the consents. The parties plainly *177 intended to, and did, execute binding agreements to extend the periods of limitations. Respondent asked each petitioner in writing to extend the period of limitations. Each petitioner fully understood the effect of agreeing to extend the period of limitations, and each knowingly assented to an extension of the period of limitations. Petitioner-partnership American Educare was represented by counsel throughout its dealing with respondent. The four individual petitioner-husbands, who were the moving forces in executing the consents, are each experienced businessmen who understood respondent's request. Additionally, three of the four consulted their accountants before executing the consents. The fourth, Mr. Newell, apparently engaged his accountant, Mr. Treadwell, after executing the consent, but Mr. Treadwell did not recommend that Mr. Newell attempt to revoke the consent. None of the petitioners was deceived about what he had done in executing his consent. [7]
*178 Petitioners nevertheless contend that the consents were induced by respondent's fraud. They accordingly urge that respondent be estopped from relying upon the consents to assert that the periods of limitations were extended. "[T]he doctrine of equitable estoppel is applied against the Government 'with the utmost caution and restraint.'" Kronish v. Commissioner, 90 T.C. at 695, quoting Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987), cert. denied 484 U.S. 896 (1987). "[T]he policy in favor of an efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context." Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962). Respondent argues that none of the petitioners has proved the elements needed to establish an effective estoppel. Respondent is correct. To establish an effective estoppel, we have stated that *179 the following conditions must be satisfied ( Kronish v. Commissioner, supra): (1) There must be a false representation or wrongful, misleading silence by the party against whom the opposing party seeks to invoke the doctrine; (2) the error must be in a statement of fact and not in an opinion or statement of law; (3) the person claiming the benefits of estoppel must be ignorant of the true facts; (4) the person claiming the benefits of estoppel must reasonably rely on the acts or statements of the one against whom estoppel is claimed; and (5) the person claiming the benefits of estoppel must be adversely affected by the acts or statements of the one against whom estoppel is claimed. Petitioner American Educare has failed to show any false statement or misleading silence by respondent. It concedes that it was fully aware of respondent's settlement position. It urges, however, that during the audit process it was asked to extend the period of limitations by Angie Sanderlin, respondent's revenue agent. She sought the extension to obtain time to ascertain the procedures necessary to extend the settlement position to American Educare consistently with the TEFRA *180 partnership provisions. When, however, an FPAA was issued to another partnership, PAE Enterprises, Mr. Moretti, and Mr. Harris decided that no settlement offer would be forthcoming for American Educare. Accordingly, they revoked petitioner American Educare's earlier consent. Respondent then issued the FPAA to American Educare within the time allowed by that revocation. American Educare now argues that the actions of respondent regarding PAE Enterprises show that respondent never intended to, or could, offer the settlement proposal to American Educare. It argues that it was thereby deceived into executing the consent. We perceive no deceit. We instead accept the testimony of respondent's Agent Sanderlin that she was indeed trying to resolve questions concerning the procedures necessary to extend the settlement offer to American Educare. American Educare has produced no evidence showing that a settlement offer would not have been extended in due course. American Educare's receipt of an FPAA instead of a settlement proposal is thus not evidence of respondent's misrepresentations or misleading silence. To the contrary, its receipt of the FPAA shows only that American Educare *181 forced respondent's hand by revoking the consent. We do not accept American Educare's assertion that the mailing of an FPAA -- instead of a settlement offer -- to PAE Enterprises proves respondent misled American Educare in stating that he intended to provide a settlement offer. The fact that a mix-up may have occurred with respect to the issuance of an FPAA to one partnership does not prove that respondent would act the same way with respect to another, and apparently substantially different, partnership. Nor is there any other basis for finding the experiences of PAE Enterprises relevant here. If PAE Enterprises is aggrieved at receiving an FPAA rather than a settlement offer, although that may have presented a problem, it does not serve as a basis for us to conclude that respondent deliberately misled American Educare about the reasons for needing additional time to submit a settlement offer to American Educare. Moreover, American Educare has failed to prove any harm resulted from the alleged deceit of respondent. Despite American Educare's revocation of its consent, it has nevertheless been given an opportunity to accept respondent's settlement offer. American Educare has *182 further failed to prove that any excess interest charges or other inconveniences it may have incurred are the result of any actions other than its own in revoking the consent that it had executed pending respondent's offer of his settlement position. American Educare has therefore failed to show that it is entitled to an estoppel; it is instead bound by the terms of its agreement to extend the period of limitations that its tax matters partner knowingly and willingly executed. For their part, the individual petitioners argue that they are each entitled to an estoppel because they relied to their detriment upon alleged false statements that "the examination of Children's Educational Leasing Promotion was not yet complete, that Respondent needed more time to consider all pertinent questions, and that by extending the Statute, the taxpayer would be given time to present his/her views." Petitioners again have failed to show that the statements they relied upon were false. Respondent's actual requests to the Salooms and Mitchells referred to the CEL promotion and stated: We are examining the tax return of an entity in which you have an interest. Adjustments may be proposed that *183 could affect your federal income tax return for 1983. The limitation period prescribed by law for assessing additional tax will expire before the entity's examination is completed. * * * Respondent's requests to the Snellings and Newells stated: While considering your Federal tax return [for the taxable year 1983], we found that the limitation period prescribed by law for assessing additional tax is due to expire soon. Unfortunately, we need more time to consider all pertinent questions. Respondent additionally advised each of the individual petitioners that "extending the limitation period will give you time to present your views, if you wish." The individual petitioners have failed to show that these statements are other than correct. Respondent's examination of the CEL promotion included formulating a general settlement position for the taxpayer-investors in that promotion. The examination, however, also included determining how that settlement position would apply to the tax liabilities of each of those taxpayer-investors. These individual determinations included contacting each of the taxpayer-investors to establish the amounts each invested in the CEL promotion. *184 Respondent, through his agents, then examined the records, and evaluated the results in terms of the CEL promotion and its effects upon the taxpayer-investor's liabilities. Respondent's agents were also required to prepare a final report with respect to each such taxpayer. The results would be provided to the taxpayer, who would have an opportunity to settle the case in accordance with the general settlement position. Additionally, the prospect remained that, in a rare instance, a taxpayer-investor might establish unique facts or circumstances sufficient to convince respondent to modify his general settlement position. The examination with respect to any of the taxpayers would be completed only with the taxpayer's protest of the examining agent's findings to respondent's Appeals Office, or with the issuance of a statutory notice of deficiency, or with a waiver of restrictions on assessment and collection. These circumstances show that respondent was accurate when he advised that he was examining an entity in which petitioners had an interest, that the examination could affect the investors' tax liabilities, that the examination was not complete, and that "we need more time to *185 consider all pertinent questions." The record is unclear whether respondent's representation that he was "examining the tax return of an entity in which you have an interest" is accurate; assuming the "entity" referred to is CEL, no tax return of CEL was produced. Petitioners, however, have not shown respondent's statement to be inaccurate. More importantly, even if there were no tax return of CEL under examination, that fact would not form the basis for any reasonable reliance by the individual investors upon a misstatement by respondent. The pertinent facts represented to those investors who received representations were that respondent was looking into the CEL promotion and that his examination might affect their personal tax liabilities. In that regard, respondent's representations were entirely correct. Petitioners have not been misled. Their characterizations of their execution of the consents are consistent with respondent's representations. Mr. Saloom understood respondent to need "more time * * * to complete the examination of the information that they were reviewing." Mr. Snelling explained that he signed the consent "to use what I thought were my rights through the *186 appeals process to present my views * * *." Mr. Newell understood that respondent needed additional time "To finish the examination of the case, that all the pertinent issues hadn't been dealt with * * *." And Mr. Mitchell "understood * * * that they were examining Children's Educational Leasing and that they needed more time to complete that examination." By the time of trial, however, petitioners produced a refinement. They testified that they would not have signed the consents if they had known that respondent had a single uniform settlement position for the CEL promotion. This refinement, however, fails to demonstrate the existence of any misstatement by respondent. Respondent's requests for extensions of time indicated generally that respondent was then still scrutinizing the CEL promotion. But nothing in those requests represented that respondent had not arrived at a uniform settlement position; in fact, those communications did not raise the topic of a uniform settlement position. Accordingly, there was neither a false representation nor a misleading silence about the existence of a uniform settlement position. See Kronish v. Commissioner, 90 T.C. at 696-697; *187 see also Klein v. Commissioner, T.C. Memo. 1986-521. Petitioners have not demonstrated any "reasonable reliance" upon that representation. Petitioners' retrospective view is that they would not have agreed to extend the limitations period -- with the attendant delay and interest charges -- if they had known that respondent had already formulated a firm settlement position. We are not convinced, however, that petitioners would have refused to extend the limitations period just because respondent had arrived at a firm settlement position. Petitioners' retrospective view does not alter the original reasons they had for extending the limitations period in the first place. At the time they were asked to extend the period for assessment, the matter of their specific liabilities remained to be resolved. They executed the consents upon the well-founded belief that they would gain an opportunity to present their views to respondent. Their dealings with respondent also suggested that, by extending the period for assessment, they might be offered a settlement by respondent. Moreover, a refusal to extend the limitations period may have risked respondent's total disallowance *188 of all their CEL-related tax benefits. In these circumstances, we fail to see how the fact that respondent had arrived at a general settlement position would be a deterrent to extending the limitations period. In these circumstances, an investor would stand to gain and would not be reluctant to extend the limitations period, regardless of the status of respondent's settlement position. On this record, one might surmise that most of the petitioners did not realize their misgivings about executing the consents until they discussed the matter in the summer of 1987. At that time it was likely that petitioners became aware of the windfall benefits that could occur if they succeeded in proving their consents invalid. In all events, on this record, the individual petitioners have failed to prove that they relied upon misrepresentations, if any, by respondent. Furthermore, to obtain the estoppel they seek, petitioners must also demonstrate actual harm resulting from the alleged misstatements, but here they have shown none. Petitioners have not demonstrated that they were denied administrative appeal procedures. The Salooms were represented before respondent by Mr. Winsor, the CPA, *189 and the Snellings dealt with respondent through their CPA, Mr. Carmichael. After they signed the consent, the Newells appointed as their representative their CPA, Mr. Treadwell, who then dealt with respondent on their behalf. Mr. Mitchell signed the consent after discussing the matter with his accountant, Phil Purdue, and then appointed Mr. Harris, the attorney for American Educare, to represent him before the Internal Revenue Service. Additionally, the existence of a firm settlement position does not, in our view, constitute any curtailment of administrative procedures to petitioners. As indicated above, the existence of a uniform settlement position for all the CEL investors assured each of them that they were being treated equally. Additionally, respondent's settlement policy was not ironclad; it permitted exceptions for investors who could show unique facts and circumstances justifying an exception from the settlement position. In this case, however, no petitioner has shown that he could claim unique facts or circumstances sufficient to be treated differently from other investors in the CEL program. Finally, although petitioners may have incurred additional interest charges *190 while waiting for respondent to offer a settlement, they have also, during that period, had the use of the funds that, they now agree, should be repaid to the Federal treasury. Their payment of interest upon sums that they have agreed are owing presents no relative hardship. [8]
The consents to extend the periods of limitations are valid, and both the notice of final partnership administrative adjustment and the notices of deficiency are timely. There is no bar to the assessment of the amounts to be determined pursuant to the stipulations of the parties. In view of the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: B. George and Deborah Saloom and David B. Edwards, docket No. 38384-87; Orvin and Phyllis Flint, Robert and Paula Snelling, James and Jeanie Grubb, docket No. 7081-88; Joe E. and Elisabeth Newell and Norman E. and Bette W. Mitchell, docket No. 22864-88. The parties have reached a basis of settlement with respect to all issues and amounts in dispute concerning petitioners David B. Edwards, docket No. 38384-87; Orvin and Phyllis Flint, docket No. 7081-88; and James and Jeanie Grubb, docket No. 7081-88.↩
2. With respect to docket No. 34128-87, involving the 1983 tax year of American Educare, Ltd., respondent has disallowed losses in excess of $ 225,187 and all investment tax credits. With respect to docket No. 38384-87, respondent has disallowed $ 3,812.50 in deductions, plus investment tax credits claimed by B. George and Deborah Saloom relating to M & S Enterprises for the taxable year 1983, as well as the carryback of unused tax credits for the years 1980, 1981, and 1982. With respect to docket No. 7081-88, respondent has disallowed $ 7,265 in deductions, plus investment tax credits claimed by Robert and Paula Snelling relating to Snelling Investments for the taxable year 1983, as well as the carryback of unused tax credits for the years 1980 and 1982. The Snellings concede the amounts involved for the year 1984. With respect to docket No. 22864-88, respondent has disallowed deductions of $ 3,812.50, plus investment tax credits claimed by Joe E. and Elisabeth Newell relating to N & E Enterprises for the year 1983, as well as the carryback of unused tax credits for the years 1980 and 1981. In the same case, respondent has disallowed deductions of $ 6,125, plus investment tax credits claimed by Norman E. and Bette W. Mitchell relating to Mitchell Cassette & Book Sales for the year 1983, as well as the carryback of unused tax credits for the years 1980 and 1981. Additionally, in docket Nos. 38384-87, 7081-88, and 22864-88, respondent has determined additions to tax under sec. 6659 and interest on deficiencies under sec. 6621(c).↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
4. It appears that this attempt to revoke the earlier consent was inoperative. The Salooms executed a Form 872, not a Form 872-A. The Form 872 does not provide for termination procedures. Instead, by its terms, it will only expire with the earlier of the ending of the period described therein or with the assessment date. In any event, the Salooms do not contend that the notice of deficiency issued to them was time-barred because it was issued after respondent received their attempted revocation of the Form 872. Their contention, rather, like that of the other petitioners, is that the consents were invalid from their inception.↩
5. It appears that this attempt to revoke the earlier consent was inoperative. Like the Salooms, the Snellings executed a Form 872, not a Form 872-A. The Form 872 does not provide for termination procedures. Instead, by its terms it will only expire with the earlier of the ending of the period described therein or with the assessment date. In any event, the Snellings do not contend that the notice of deficiency issued to them was time-barred because it was issued after respondent received their attempted revocation of the Form 872, nor because it was issued more than 90 days following their submission of the notice of termination. As with the other petitioners, the only issue is whether the consent to extend the limitations period is invalid ab initio.↩
6. The consent form signed by the Mitchells provided that respondent would have 90 days to reinstitute his assessment procedures after the date that respondent received↩ the notice of termination. Accordingly, a statutory notice would have to be issued by Sept. 18, 1988. The Mitchells therefore do not contend that the notice of deficiency was issued too long after the signing of the termination notice. Again, like their fellow petitioners, their only claim is that their consent extending the limitations period was invalid ab initio.
7. Petitioners rely on Robertson v. Commissioner, T.C. Memo. 1973-205↩, to urge that the consents in this case are invalid. That case, however, is inapposite. It involved substantially different facts, and it did not address a defense of misrepresentation to respondent's attempts to enforce the terms of facially valid consents.
8. We have not addressed each of the elements that petitioners are required to establish to impose an estoppel upon respondent. The fact that we have not done so should not be construed to mean that we find that petitioners have established those elements. Rather, our determination as to the elements we have addressed suffices to show that an estoppel is not warranted here.↩